BROWN, Chief Judge.
| ]Arguments between two local rap artists escalated into the death of 26-year-old Kiran Pierson and the second degree murder indictment of 27-year-old Brian Johnson. Claiming justification/self-defense, Johnson waived a jury and elected to have a bench trial. After considering the evidence, the judge found Johnson guilty of manslaughter, a lesser and responsive crime, and thereafter sentenced Johnson to 20 years at hard labor, the minimum term required by the Firearm Enhancement Statute, La. C. Cr. P. art. 893.3 E(l)(a). A timely motion for reconsideration of sentence was denied, and this appeal ensued. We affirm.

*372
Discussion

Sufficiency of the EvidencelSelf-Defense

On July 5, 2005, shortly before three o’clock in the afternoon, defendant, Brian Johnson, shot Kiran Pierson multiple times with a .45 caliber pistol. Two days before the shooting, at a local skating rink in Shreveport, Louisiana, defendant had confronted the victim’s brother, Kevin Pierson (“KP”). Defendant believed that KP’s rap lyrics about defendant’s brother, another local rap artist, were disrespectful. KP and defendant’s discussion became heated. Both summoned friends. Defendant pulled a gun. KP and his group ran back inside the skating rink. KP began performing, but the police closed the event. Later, KP told his brother, Kiran, about the incident. Kiran was upset and decided to confront defendant.
The afternoon of July 5, 2005, Kiran and KP went to defendant’s place of employment, Fat Boyz Barber Shop, in Shreveport. Kiran called ^defendant outside. They bumped chests and got in each other’s faces. Kiran was 6 foot 6 inches tall and weighed about 260 pounds. Defendant was 5 foot 8 inches tall and weighed about 180 pounds.[1] Others in the barber shop rushed outside.
Lawrence Sonnier, Jr,, was working at the barber shop on the day of the shooting. Lawrence worked with defendant and had been friends with Kiran and KP for a long time. Lawrence said that KP came to his house the morning of the shooting and told him about the skating rink incident. KP told Lawrence, “Your boy got to go, man,” and Lawrence took that to mean defendant was to be killed. Lawrence told KP, “You need to chill out on that there, man.” When KP left his home, Lawrence believed that the issue was “squashed.”
Later, Lawrence saw KP, Kiran, and Chauncey Broadway[2] come to the barber shop. Kiran opened the door and called defendant to step outside. Lawrence knew defendant was armed. Lawrence said that the shop was in a rough neighborhood, and they all carried guns. Lawrence wanted to stop the trouble. Lawrence grabbed Kiran’s arm but was pushed away. Lawrence attempted to get KP to intervene. KP told Lawrence that the matter did not involve Lawrence and pushed him back through the barber shop door. Lawrence went back outside and saw defendant pull an “iron” and turned to run but was hit by a bullet in the leg. Lawrence went back into the shop and called 9-1-1 and heard several more shots as he made the |scall. After Lawrence placed the call, he went back outside where he saw Kiran lying face down on the ground. Lawrence tired to help Kiran. Everyone else had fled the scene.
Deshawn Vallet was also a barber who worked with defendant at the Fat Boyz shop. He was working on the day of the shooting. According to Deshawn, Kiran and KP came to the barber shop and confronted defendant. Kiran asked defendant to step outside the shop. Deshawn was inside the shop when he saw that Kiran had defendant “pinned up” against the brick wall by placing his hands on the wall and standing with his chest against defendant’s chest. Deshawn did not see any fighting nor did he see any weapons. Deshawn went outside to break up the trouble, then defendant pulled a gun and shots were fired. Kiran fell to the ground. Deshawn realized that he had been “hit” and ran across the street to where his *373 mother worked. Deshawn believed that Kiran had brass knuckles on his left hand but did not see Kiran hit anyone. Desh-awn testified that defendant attempted to get away from Kiran but “he was just steady on [defendant].”
KP, the victim’s brother, a local rapper, testified about the incident at the skating rink. Later, KP told his brother Kiran what happened, and Kiran was upset. Ki-ran told KP he wanted to talk to defendant. On the day of the shooting, Kiran asked KP to go with him to the barber shop where defendant worked. It was Kiran’s intent to confront defendant about the incident at the skating rink. Once they arrived at the barber shop, Kiran told KP to wait in the car; however, KP got out and walked toward the barber |4shop where his brother and defendant were arguing. Several others came outside the barber shop to stop the trouble.
KP recalled Marcus Frederick coming out of the shop and getting between defendant and Kiran.[3] Then shots rang out, prompting KP to move behind a nearby car. KP saw defendant firing the gun. KP saw defendant walk over to his brother, who was on the ground face down, and shoot him three more times. Defendant then ran around the building. KP testified that he did not see his brother with a gun or any other weapon. After the shooting, KP left the scene without checking on his brother. KP admitted to prior convictions for possession of marijuana.
On cross-examination, KP stated that he told Lawrence Sonnier about the incident at the skating rink but denied talking about killing defendant. When KP denied telling police that his brother was mad prior to going to the barber shop, the defense played KP’s recorded statement to police wherein he told officers that “[Ki-ran] was mad already [before going to the barber shop].” KP denied seeing Kiran with brass knuckles or a gun. KP stated that he did not see Kiran touch defendant or see Kiran “pin” defendant against the outside wall of the barber shop. KP told the prosecutor that Chauncey Broadway, who came to the shop with Kiran, was in the vehicle with him as he drove away after his brother was shot.
Corporal S.T. McKenna of the Shreveport Police Department testified that he was one of the first officers on the scene, and he observed the victim lying face down on the ground. Corporal McKenna did not see any brass ^knuckles at the scene. A gun in Kiran’s pocket was found as paramedics were administering aid to the victim. Corporal McKenna used scissors to cut the pocket out of the pants so he would not disturb the weapon. Corporal McKen-na stated that he was not aware of the weapon before being alerted to it by the paramedics.
Sergeant Danny Duddy of the Shreveport Police Department processed the crime scene including collecting evidence and taking photographs. Sergeant Duddy collected the weapon from the pocket which had been cut from the victim’s pants. Sergeant Duddy noted that the weapon, which was a ,9mm pistol, had a loaded magazine but that it was not ready to fire as there was nothing in the slide. Eight .45-caliber cartridge casings and one ,9mm cartridge casing were found at the scene. Sergeant Duddy did not find any brass knuckles at the scene.
Richard Beighley, the firearms section supervisor with the North Louisiana Crime Lab, was qualified as an expert in firearms identification. Beighley opined that the ,9mm gun recovered from Kiran’s pants pocket had not been fired or cleaned *374 in quite some time. After photographing the inside of the barrel, he test-fired the weapon, and it was functional. Beighley said that the .9mm casing found at the scene was not fired from the gun recovered from the victim.
The coroner, Dr. George McCormick, suddenly died before he could complete his report. A forensic pathologist helped write the report from Dr. McCormick’s notes. The report was filed into evidence. The report showed that the victim was shot seven times, all left to right. Three times were 1 (¡posterior to anterior (back to front), three times anterior to posterior (front to back), and once with no distinction as to front or back.
After the state concluded its case in chief, defendant presented several witnesses, including Joel Young, who worked at the barber shop with defendant and was present at the skating rink when defendant had the altercation with KP. Young is a rap artist also and was doing the show at the skating rink with KP. Young said that defendant pulled a weapon out but did not point it at anyone. A few days later while at the barber shop, Young saw Lawrence talk to someone, then have a conversation with defendant. Young feared that something was going to happen, so he left the shop and was not there when the shooting occurred.
Theodus “T.J.” Douglas testified that he went to the barber shop to have his brother, Reginald, cut his hair. After finding out that his brother had gone to lunch, T.J. sat down to wait for him and talked to defendant. T.J. saw the victim, Kiran, and another man come to the door of the barber shop and demand that defendant come outside. Defendant went outside and was surrounded by the victim and the other man. Defendant appeared to be cowering down while the men pinned him against the window of the barber shop. Douglas could see Lawrence and Deshawn outside trying to defuse or stop the trouble. Douglas heard shots but was not sure where they were coming from or who was firing. Douglas ran toward the back door but then turned around and came back outside where he saw the victim lying on the ground. Douglas said he saw rings or brass knuckles on the victim’s left 17hand. Douglas said he saw Quincy, the guy who owned the shop, drive up and jump out of his car and go over to Kiran.[4]
Defendant testified on his own behalf. Defendant said that the incident at the skating rink started when he attempted to talk to KP about his harassment of defendant’s brother, Jamie. Both Jamie and KP were local rap artists who had become embroiled in “rap battling” that was turning personal. KP went inside the skating rink, and defendant went to his car. Shortly thereafter, KP returned with six or seven guys and started arguing with defendant. In response, defendant pulled his pistol and put it down by his side. The group ran, and defendant left the scene.
Two days later, on July 5, 2005, defendant was working at the barber shop when Lawrence asked him about the incident at the skating rink. Defendant replied that he had been trying to stop any potential conflict. Lawrence told him, “Man, they say you got to go, man.” When asked what this meant, Lawrence said, “They said they put a hit out on you, brother.” Defendant was frightened by this information. Defendant acknowledged that he always had a gun with him because of the high crime area where the shop was located.
Defendant saw Kiran’s car pull into the parking lot and park down by the car *375 wash. Kiran walked to the barber shop and pushed the door open with one hand while his other hand was in his pocket. Defendant testified that he knew the victim had a gun in his pocket because he had his hand around the handle of the gun. Kiran told defendant, “Say player, come | Routside. I need to holler at you.” Defendant stated that he told Kiran, “You can come inside if you want to talk to me. What you got your hand in your pocket for, man? I know you strapped, man. What you got your hand in your pocket for?” Kiran continued to tell defendant to come outside and began using profanity. Defendant then went outside, and Kiran pushed him against the window of the barber shop. Kiran told defendant, “You pull a gun on me. If you pull a gun on my brother, pull a gun on me.” Defendant testified that he was scared, and everything was happening fast.
Defendant testified that the larger victim pushed him against the window again as he was trying to explain what happened at the skating rink. Defendant stated that he saw the victim “go for his pistol” so he went for his and, “I just went to shooting.” Defendant could not recall how many shots were fired, but after he fired, he ran away because he was scared. “I had two more boys there, you know, wanting to kill me.” As he was running, he threw away his gun and a jersey he was wearing. Defendant talked to various friends and acquaintances before finding someone to give him a ride. He went back and retrieved the gun, then went to his sister’s house. He turned himself in the next day.
It is settled law that the state has the burden to prove beyond a reasonable doubt that defendant is guilty. That burden includes that the criminal action was not excusable (accidental) or justifiable (self-defense). In this case, the issue is whether the state proved beyond a reasonable doubt that defendant did not act with justification or in self-defense. State ex rel. D.P.B., 02-1742 (La.05/20/03), 846 So.2d 758. Self-defense is | ¡justification for a killing only if the person committing the homicide reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that deadly force is necessary to save his life. La. R.S. 14:20 B(1); State v. Dooley, 38,768 (La.App. 2d Cir.09/22/04), 882 So.2d 731, writ denied, 04-2645 (La.02/18/05), 896 So.2d 30.
An appellate court’s standard of review is whether the evidence considered in the light most favorable to upholding the verdict is sufficient to convince a reasonable trier of fact that the essential elements of the crime were proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). An element of the crime, in this case, is that defendant did not act with justification.
Clearly, the victim, Kiran Pierson, was initially the aggressor. Kiran went to defendant’s place of business. Kiran called defendant out. Kiran had a gun in his pocket. Kiran was bigger than defendant. Kiran bumped defendant with his chest. Kiran was threatening. On the other hand, Kiran never pulled out his gun and never hit defendant. Other parties who knew both Kiran and defendant got between the two and were pushing Kiran back when defendant started shooting. A total of eight shots were fired by defendant. Two of the intervening bystanders were hit. Kiran was shot seven times. Defendant walked over to Kiran while he was lying face down and shot him several times. Defendant claimed that he saw Kiran “go for his pistol.” The physical evidence and all of the eyewitnesses’ testimonies overwhelmingly showed that Kiran did not “go for his pistol.”
*376 | iflViewing the evidence in the light most favorable to the prosecution, a rational or reasonable juror or judge could have found beyond a reasonable doubt that the shooting was not justifiable. Shooting the victim seven times, including while he lay prostrate on the ground, indicates anger not self-defense. Finding that the victim provoked that anger, the trial court correctly convicted defendant of manslaughter.[5]

Application of Firearm Enhancement Provision

The court imposed the minimum sentence required by the Firearm Enhancement Act. La. C. Cr. P. art. 893.8 provides in part:
(E) (l)(a) Notwithstanding any provision of the law to the contrary, if the defendant commits a felony with a firearm as provided for in this Article, and the crime is considered a violent felony as defined in this Paragraph, the court shall impose a minimum term of imprisonment of ten years. In addition, if the firearm is discharged during the commission of such a violent felony, the court shall impose a minimum term of imprisonment of twenty years. (Emphasis added).
(b) A “violent felony” for the purposes of this Paragraph is: second degree sexual battery, aggravated burglary, carjacking, armed robbery, second degree kidnapping, manslaughter, or forcible rape. (Emphasis added). (Note: murder not included.)
(2) A sentence imposed under this Paragraph shall be without benefit of parole, probation or suspension of sentence.
La. C. Cr. P. art. 893.1 provides a notice requirement as follows:
, (A) If the district attorney intends to move for imposition of sentence under the provisions of Article 893.3, he shall file a motion within a reasonable period of time prior to commencement of trial of the felony or specifically enumerated misdemeanor in which the firearm was used.
|uDuring plea bargain discussions, the state informed defense counsel of its intent to implement the firearm enhancement provision if defendant pled to manslaughter. Defendant acknowledges that following these discussions a motion was filed into the record by the state prior to the commencement of trial; however, he contends that there was no service made upon him or his attorney. The motion in the record is stamped as filed on October 8, 2007, and the second page of the motion containing the certificate of service is unsigned.
In State v. Curtis, 04-111 (La.App. 3rd Cir.08/04/04), 880 So.2d 112, writ denied, 04-2277 (La.01/28/05), 893 So.2d 71, defendant was originally charged with second degree murder. On the day after a jury was empaneled, defendant pled guilty to manslaughter. The state’s notice to seek sentencing under the firearm enhancement provision was filed on the day of defendant’s sentencing. In that case, defendant’s attorney had been informed in plea discussions that the state would seek the penalty enhancement if defendant pled to manslaughter. The court held that these acts were sufficient to inform defendant of the state’s intent to envoke the penalty enhancement.
*377 It the instant case, defendant was informed prior to trial that the sentencing enhancement provision would be used in the event of a plea to manslaughter. At that time, the state actually filed a notice, even though the sentencing enhancement provision was not applicable in a second degree murder case. See State v. Curtis, supra. After defendant was convicted of manslaughter, the state reiterated its intent to proceed under the firearm | ^enhancement act. There was no undue surprise or additional burden placed on defendant. In fact, defendant’s attorney claims that he first learned about the notice during the January 28, 2008, hearing, and defendant’s sentencing was held almost three months later on April 21, 2008.

Motion for New Trial

Defendant orally moved for a new trial after sentencing, and the court said it would hear the motion on May 12, 2008. No reasons for the motion were given. At that time, the defense attorney indicated that the motion would be put into writing.[6] No written motion was filed, and there is no indication in the record that the hearing was held. Considering the fact that defendant failed to follow up on the oral motion as required by statute, it is considered abandoned.

Conclusion

For the foregoing reasons, defendant’s conviction and sentence are affirmed.

. The coroner measured Kiran. The police report said that defendant was 6 feet but defendant testified that he was 5'6" or 5'8".

. Chauncey Broadway died before the trial.

. Marcus Frederick did not testify.

. Quincy did not testify.

. For the same reasons, the trial court properly denied defendant's motion for post judgment verdict of acquittal.

. La. C. Cr. P. art. 852 provides, a motion for a new trial shall be in writing, shall state the grounds upon which it is based, and shall be tried contradictorily with the district attorney.